# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

FEDERAL TRADE COMMISSION,

  Plaintiff,

    v.

CAREER STEP, LLC, a limited liability company, also d/b/a CareerStep, CareerCert, and Carrus,

  Defendant.

Case No. _____

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.     The FTC brings this action for Defendant's violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6821, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, the GLB Act, and the TSR.

## SUMMARY OF THE CASE

2.     Career Step is a for-profit, educational institution headquartered in Georgia, primarily focused on offering online career-training and certification programs in the healthcare field.  Career Step targets military servicemembers and their spouses, using digital and social media advertising, artificial intelligence ("AI") technology, and its website, and by marketing on military bases.

1

3.      Since at least 2019, Career Step has used false or unsubstantiated representations to convince consumers to enroll in its programs.  Specifically, Career Step lures consumers with inflated employment rates and deceptive job placement claims, misrepresentations about externships, misrepresentations about the typical time-to-completion for its programs, and a deceptive incentivized review program, in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

4.      Defendant made these misrepresentations and deceived consumers into handing over their sensitive personal and financial information to sign up for its programs, in violation of the GLB Act, and made these misrepresentations in telemarketing calls with prospective consumers, in violation of the TSR.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

6.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.  The FTC also enforces the GLB Act, which prohibits any person from using a false, fictitious, or fraudulent statement to obtain or attempt to

2

obtain the customer information of a financial institution from a customer of a financial institution.

## DEFENDANT

8.      Defendant Career Step, LLC ("Career Step"), also doing business as CareerStep, CareerCert, and Carrus, is a Georgia limited liability company with its principal place of business at 5051 Peachtree Corners Cir., #200, Norcross, GA 30092.  Career Step transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Career Step has advertised, marketed, distributed, or sold educational services to consumers throughout the United States.

## COMMERCE

9.      At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

10.      Career Step markets educational services that it claims will help consumers "prepare for certification, connect with employers, and advance their careers."  Career Step's programs purport to prepare consumers for careers in the healthcare industry including Medical Billing and Coding, Medical Assistant, Dental Assistant, Pharmacy Technician, Hemodialysis Technician, and others.  Enrolled consumers complete their coursework exclusively online, but many of the programs also require an in-person externship component or clinical hours.

11.      Career Step relies on digital advertising, social media, and its website to market its programs and uses sales representatives and AI technology to persuade consumers to enroll. For example, Career Step advertises on Facebook, Instagram, LinkedIn, Twitter, YouTube, Google, and Bing, and also uses promotional emails and engages in search engine optimization

to steer consumers to its website. For example, Career Step posted the below advertisement on Instagram in August 2021:



12.     Many of Career Step's digital and social media advertisements have targeted military consumers, who Career Step calls their "key audience" in internal marketing documents. For example, Career Step posted the below advertisement on Facebook in January 2024:



13.     Career Step also specifically targets servicemembers and spouses on its website,

touting its "partnerships" with My Career Advancement Account ("MyCAA") (a Department of

Defense workforce development program offering financial assistance to eligible military

spouses), Army Credentialing Assistance ("ACA") (a U.S. Army tuition assistance program for

eligible active duty soldiers), and other military organizations, offering "dedicated Military

Career Advisors," and promising "flexible training" for "highly portable careers."  Additionally,

Career Step advertises in military-focused publications and periodically attends events sponsored

by the military, including job fairs, where it promotes its programs to military members and their

families and provides marketing materials to training officers to distribute to servicemembers.

14.     Career Step's website touts that it has enrolled over 150,000 consumers since

opening its doors, including "over 20,000 Soldiers, Marines, Airmen, Coasties, Sailors, and their

Spouses."  Since 2020, Career Step has enrolled more than 30,000 consumers into its programs.

Consumers can either enroll online through Career Step's website or on the phone with Career

Step sales representatives, who Career Step holds out to consumers as "Career Advisors."

Consumers generally start on Career Step's website after, for example, clicking through a

targeted ad on social media or through a promotional email they received.  Once on the site,

consumers may enroll online by clicking on a particular program page, clicking the button

labeled "Add to Cart," and then proceeding through the checkout and registration process online.

Alternatively, consumers may be enrolled over the phone by a Career Step representative by

calling the number listed on the Career Step website.  Finally, students may be put in touch with

a Career Step representative by clicking a button on the Career Step home page labeled "Request

Info" and then filling out and submitting the information form on the next screen.  Career Step

representatives may call, text, or email students who submit this form online.

15.     Starting in June 2022, Career Step partnered with Aktify, an "advanced AI

platform" designed to "replicate human sales representatives."  Career Step provides Aktify with a list of consumers who have asked Career Step to contact them by submitting a request for information.  Aktify then uses conversational artificial intelligence ("AI") software to contact the consumers via text message in order to initiate a conversation.  If the consumer indicates that they are currently free to receive a call or schedules a future call, Aktify calls the consumer in response to the message or at the scheduled time then immediately connects the consumer with a Career Step sales representative.  If the consumer asks a question via text message, Aktify will use conversational language recognition to identify which of several Career Step pre-approved, pre-scripted responses best fits the consumer's question.  For example, one such script states, "you can get all of your required books, supplies, and associated materials required for an approved training course and/or exam paid for by the US Army up to $4,000 per fiscal year."  Aktify then automatically routes any resulting follow-up telephone calls to Career Step's sales team to enroll the consumer over the phone.

16.     Career Step sales representatives are incentivized to "overcome learner objections," under a payment structure where "the more you sell, the more you earn."  Sales representatives are paid a commission for enrolling consumers in Career Step programs, have to hit monthly sales quotas, and can earn bonuses for enrolling highly desired consumers such as consumers that are affiliated with the military (who bring government funding to cover the cost of their education).  Career Step marketing documents also encourage sales representatives to "upsell" enrolling consumers on more training or optional add-on products such as an IV needle kit for additional practice ("venipuncture kit") or one-on-one support sessions ("AdvantEDGE").

17.     Career Step charges consumers between $1,899 to $4,299 to enroll in one of their programs.  This price provides consumers with access to their course for 4, 8, or 12 months

depending on the program.  If the course cannot be completed in that time, consumers must purchase an "extension," ranging from $129 for an additional month to $999 for an additional 12 months of access.  Consumers who purchase the optional venipuncture kit are charged an additional $199, and those who purchase support sessions must pay from $299 for 4 sessions up to $799 for 12 sessions.  In some instances, sales representatives have been allowed to "automatically upsell" the venipuncture kits to consumers by including this additional amount in the quoted price for tuition without telling consumers they are paying for an optional add-on.  In other instances, consumers have reported being sold the optional support sessions under the guise that they wouldn't be able to finish their program without them.

18.     Consumers can pay Career Step directly, utilize military funding programs such as MyCAA and ACA, or enter an installment payment plan offered by Career Step and serviced through Monterey Financial Services.  MyCAA provides up to $4,000 of financial assistance to qualified military spouses pursuing career-training opportunities, and ACA provides the same for qualified service members.  For either program, once the $4,000 is spent, the servicemember or military spouse cannot get more funds. Career Step does not participate in federal financial aid programs administered pursuant to Title IV of the Higher Education Act.

19.     Since at least 2019 through the present day, Career Step has made myriad claims on its website, in emails, and over the phone to convince consumers to enroll in its programs.

## Employment Outcome Claims

20.     Career Step has represented to consumers that most of its learners are employed in their field of study.  For example, Career Step has included the following claim on its website:

- Focused on learner success. **CareerStep learners crush it the job market. For example:**
  - **Most of our learners are employed in their field of study.**
  - **Most of our employed Medical Transcription completers are able to work from home in their first job.**
  - **Our Medical Coding and Billing completers report a certification exam pass rate higher than the national average.**
  - **Our Pharmacy Technician learners can take advantage of externship opportunities with Walgreens and CVS Pharmacy.**

21.  Career Step also has represented on its website, in sponsored news articles, and to prospective enrollees that more than 80% of Career Step "graduates," a/k/a "completers," obtain employment in their field of study.  For example, Career Step has represented on its website that "84% of graduates get jobs in their field."  Career Step representatives also have made this claim in comments left on various blog posts on the Career Step website.  For example, one Career Step Admin wrote, "[O]ver 84% of Career Step graduates are employed in their field of study" in a comment appended to a blog post from August 13, 2018 titled, "Why CareerStep is Perfect for Military Spouses."  Another Career Step Admin left the same comment on a Career Step blog post titled, "Is Learning Medical Coding as Hard as it Seems?" from July 12, 2019.  These comments were visible to consumers until October 2023 when they were removed in response to the FTC's investigation.

22.  In a Career Step sponsored article posted on "The Work at Home Wife" webpage in 2019, and still available online today, the author quotes the same 84% figure from Career Step's website:

- Per their website "over 84% of Career Step graduates are employed in their field of study, **92% of employed Medical Transcription graduates work from home in their first job**, Medical Coding and Billing graduates report a certification exam pass rate that's a full 15 percentage points higher than the national average."

23.     The Career Step CEO was interviewed for another article published on Military.com on February 13, 2020, and still available online today, which claims that Career Step programs have "an employment rate of around 80%."  Career Step proudly touted this article internally as an example of "Carrus in the news".

*Military.com*

*Thanks to a grant from the Army Credentialing Assistance Program (ACA), Carrus officials are looking to expand their training of spouses and military members with its no-cost, short-term training program that has an employment rate of around 80%. Frost says it's a training and certification program anyone can take, even if their day job is turning the wrenches on an F-35. And they've already got a good track record. Even before receiving the grant they had already trained 20,000 military spouses in healthcare careers.*
*(02.13.20)*

24.     Career Step also encourages sales representatives to highlight this claim for prospective enrollees via email.  An email template that Career Step provided to its representatives boasts that, "At Career Step, our graduates find jobs shortly after graduation." This particular email template went out to more than 2,500 consumers.  In numerous other instances, Career Step representatives make specific percentage representations to prospective students by email.  For example, Career Step representatives emailed the following claims to prospective students to entice them to enroll:

- "84% of our graduates have a job shortly after graduation."

- "86% of our honors graduates have a job shortly after graduation."

- "88% of our graduates have a job shortly after graduation. Honors students have a 94% placement rate."

- "90% of our graduates have gained employment within 60 days of graduating (many graduates find employment immediately)."

- "With this support and our partnerships is the reason that 94% of Career Step students find a job shortly after graduation."

25.     Another Career Step sales representatives promised a prospective student "graduate support for job placement (94% success rate--and ALL are working from home!)." A few weeks later when the same consumer asked to cancel her program, the representative convinced her to stay enrolled by claiming that Career Step was "still placing 94% of our medical transcriptionists across the board (medical background or not)."

26.     Career Step sales representatives reinforce these career outcome claims on the phone with prospective enrollees. For example, one representative told a consumer that "it's in the low 80s percentage of people who do get employment." Another representative touted, "The really cool thing is that most of our learners are actually able to finish their program, complete the training, get their certification, and are working in around four months." In fact, a common representation that Career Step representatives make on the phone is that most learners are "in and out and working…in a few months." In numerous instances, representatives even claim that "A large amount of [Career Step] learners are hired before certification."

27.     Career Step's purported substantiation for these employment outcome claims is based entirely on an optional survey sent only to consumers who have completed their program.

28.     In fact, "most learners" never complete the program at all. On average, since at least 2019, the percentage of Career Step consumers who completed the program was 25% or

10

less per year.  For example, the number of consumers who enrolled in a Career Step Program in 2020 was 9,330, but only 2,126 (23%) of those consumers completed the program.  Because Career Step sends surveys only to program-completers, over three-quarters of enrolled consumers never even receive one.  Thus, Career Step has no basis for its employment claims about "most learners."

29.     Of the enrolled consumers that do receive a survey, most of them do not respond.  For example, out of the 9,330 enrollees and 2,126 program-completers from 2020 described above, only 505 actually responded to the survey (5% of enrollees or 24% of program-completers).  This small pool of consumers is unrepresentative of "most learners."

30.     An internal email from Career Step's CFO to the CEO acknowledges this: "If we send out 100 surveys and only 10 people took it and 6 people responded that they got a job with the help of our training, then placement rate = 60%."

31.     Even using Career Step's own unrepresentative calculation method, its employment outcome claims are false.  Career Step has acknowledged that, "[o]f the learners who answered the 'Are you employed?' prompt, 34% answered 'Yes' and 66% answered 'No.'"  Thirty-four percent (34%) brings the 505 respondents who enrolled in 2020 to about 172 (~2% of learners or ~8% of program-completers) who are actually employed.  Further, Career Step has acknowledged that some of the consumers who responded Yes "may have had pre-existing relationships with their employers," and thus likely did not obtain employment as a result of attending Career Step.

32.     Career Step's own reporting to a state regulator also indicates its claims to consumers are false.  According to Career Step's registration application that it filed with the Utah Division of Consumer Protection, Career Step had a 13% completion rate and 43%

11

graduate employment rate for the 12-month period preceding October 27, 2022.

33.     Career Step executives knew that their career outcome claims were based entirely on incomplete and unreliable survey data.  For example, in an email dated September 18, 2020, a Career Step compliance specialist warned, "We can't do any job placement or pass rates.  Our information is not concrete and we don't want to give non-concrete information to Learners."  The Career Step compliance specialist sent the email in response to a sales representative claiming to a consumer that "*86% of our honors graduates have a job shortly after graduation."  And in an email dated November 16, 2020, the Career Step General Manager noted that "Our job placement data is currently self-reported through our learner survey process and we are working hard to improve its reliability."

34.     In an internal email from October 19, 2020, the CFO of Carrus acknowledged to the CEO that "the survey data is biased to completers who respond" but hedged by claiming that "if our underlying placement rate was really bad, then we would be savaged in BBB and TrustPilot and be out of business really fast."  Later, in a separate email conversation from January 28, 2021, the CFO admitted, "the placement data is based on surveys that go out and are responded to, which is not the greatest way to measure this metric, but it is all we have for right now."  Career Step nonetheless continued making employment outcome claims in various communications as outlined above.

35.     Employment outcome claims are material to consumers who, during the enrollment process, routinely ask questions about how their training will affect their ability to obtain a job.  If consumers knew that the employment success rate was lower than advertised, it would likely affect their conduct, including whether to attend Career Step.  For example, one consumer told Career Step that she had been "deceived into taking the program" by the claim

that Career Step had an "88% job placement guaranteed rate for helping learners find work" and that she would not have signed up for it otherwise.

36.     Consumers have complained about these misrepresentations and about the dearth of actual job opportunities available for Career Step students.  One consumer lamented that Career Step was "misleading about career opportunities" when they convinced her to enroll. Another consumer reported, "My sister in law has taken the course and graduated from it. She cannot get any employment because they do not hire from there."

**Employer-Partner and Job Placement Claims**

37.     Career Step represents on its website that it partners with leading businesses in the healthcare industry to provide jobs for its graduates.  Career Step references its "employer network" and "hiring partners" in multiple areas of its website including the "Learner Support" and "Career Services" tabs.  The Career Step home page prominently features the logos of well-known companies, such as CVS and Walgreens, alongside the title "Our Trusted Employer Network."



38.     Navigating to the "Train With Us" tab on Career Step's website brings consumers to another display of partner logos alongside the claim that Career Step will help learners "connect with potential employers."

## We're Connected

With our sprawling network of partners, we'll help prepare you to earn clinical hours, connect with potential employers, and build a foundation for success.

    

39.     Career Step's "Career Services" tab has hosted the heading "Turn Your Training into Gainful Employment," and under a subheader titled "Clinical Hours and & Hiring Partners" states that Career Step "work[s] hard to build relationships with employers all over the country—many of which hire our Learners."

## Turn Your Training Into Gainful Employment


**Career Development Community**
CareerStep's online community provides valuable career-centric resources to help you network, job search, and interview.


**Resumé & Cover Letter Examples**
Hiring managers review countless resumes. And that errant typo or professional faux pas could get yours tossed in the trash. With access to pristine examples, you'll learn how to polish your resume and cover letter before you hit the pavement and start your job search.


**Interview Tips & Tricks**
If you bomb an interview, no amount of flashy qualifications and glowing referrals can save you. Our awesome job interview materials cover everything from appropriate dress and language to question prep—and other tips and tricks. You'll walk into every interview confident, poised, and dressed to impress.


**Clinical Hours & Hiring Partners**
We work hard to build relationships with employers all over the country—many of which hire our Learners. And with real-world clinical opportunities, you'll develop relationships that could lead to full-time work. We'll let you know when companies in your areas are hiring so you don't miss out on the opportunity.

This claim was visible on the website through at least February 2023, though Career Step made changes to it after learning of the FTC's investigation.  The current iteration still references "hiring partners" under the same heading about turning Career Step training into "gainful employment."

40.     Building on the impression created on the website, Career Step representatives also make these claims via email and on the phone with prospective enrollees.  For example, one Career Step representative bragged to a prospective enrollee that, "We're the only program that

14

is partnered and contracted with employers." The consumer then asked if Career Step helped with "career placement," and the representative responded, "Yeah, we are the only program that does that…So we are partnered with a couple of employers for that, that are pretty desperate right now." Other examples of what Career Step representatives have claimed on the phone include:

- "Career Step is the only program that is partnered and contracted with employers. So there is about 16,000 different employers that hire through Career Step. Big insurance companies like Humana, or like RCN Health Care Staffing, which staffs for the hospitals. So once you finish the course there is actually job placement that is included with this program too."

- "So we have hiring partners, we have employing partners, we have a lot of connections, our partners have job openings that need to be filled. We are going to be able to connect you to our partners and help you find a job and get working after you have passed your exam…So we're gonna [sic] easily be able to find you a job and get working once you are certified."

- "We basically send her the places that we are partnered with and if she is not interested in the places we are partnered with, we will help find her somewhere else even if we are not partnered with them…All she has to do is basically show up for the interview, get the job, get working."

- "We have over 50,000 partnerships so we'll help you find some place to work."

41.    In other instances, Career Step representatives promise consumers that Career Step will find a job for them upon program-completion. For example, representatives have made the following claims on the phone with prospective enrollees:

- "That's where our career placement team is gonna [sic] step in and find you the perfect job."

- "We'll make sure that as soon as you're done with the program that you are walking into a job in one of those facilities…We'll kind of do all the groundwork for you, you just kind of have to show up and smile, show up for the interview itself."

- "We can actually get you into a paid position before you're even done with the program.  So after you've completed about half the modules, we can help you get interviewed and hired there [at a partner company]."

- "By the time he's passed his exam, he should already be working at the hospital that we've placed him at.  If not, our team can easily help him find a job elsewhere."

These examples are representative of the types of job-placement claims that Career Step's sales team makes to prospective enrollees in numerous instances.

42.     All of Career Step's job-placement claims are without basis or false.  For starters, despite prominent logo placement on Career Step's website, the only relationship that Career Step has with CVS, Walgreens, and DaVita is an "externship training partnership" meaning that students enrolled in certain programs that satisfy certain other criteria *may* be placed with these companies for an externship as part of their training program.  Nothing in Career Step's agreements with these companies provide for Career Step students to be placed in jobs post-graduation.  Career Step's relationship with the San Francisco Department of Public Health doesn't entail placement of any type; Career Step merely provides training to coders already employed there.

16

43.     Career Step's agreements with Grace Health and Excela Health do offer them the "first option" to hire Career Step students who have been placed with them for an externship.  If either of these companies exercise this option, they have to pay Career Step $1,500 per student hired.  In reality, Career Step has only been able to point to 6 students (out of tens of thousands of enrollees) employed by Grace Health and 5 students employed by Excela Health.  Two of these students indicated that they "already worked there" and for the others, Career Step possessed no records verifying that these students were hired as a result of Career Step's partnership with the company or whether they already worked at these companies prior to enrollment at Career Step.

44.     When asked about the job-placement assistance Career Step actually provides, Career Step has stated that it is not "contractually required" to help its students seeking full-time employment after program-completion but that if a student "approaches" Career Step seeking full-time employment assistance, Career Step "uses its partnership repository to identify potential partners that have a present need for a full-time employee and are located in close proximity to the learner."  Career Step has acknowledged that "the Company does not maintain data regarding the number of students per year that it assists in finding full-time employment through the partnership repository."

45.     In fact, Career Step has admitted that it "only places learners in externships," but that "if a learner was offered a job from their externship, then the job placement would have resulted from the partnership repository."  However, most Career Step students—even of those in externship-required programs—never get an externship from the partnership repository, and Career Step acknowledged that it "does not track whether learners who obtain externships later obtain employment from the same employer."

17

46.     Career Step sometimes has assisted program-completers with their resume or has emailed them links to job postings generally available on the internet.  Even this assistance is limited, however.  An internal document noted, "We only assist with the job placement search for so long."  Beginning in 2021, job search assistance was restricted to 1-month post-graduation, available by appointment only.  The difference between the job placement promised and the "career services" actually offered was highlighted by one Career Step program-completer who recounted, "Once I graduated, I was sent an email with job listing websites and had my resume reviewed. Although this has been helpful, I remember when I enrolled in Career Step, one of the reasons I was so drawn to the school was because of the claim that I would be actively helped to get a job and that many Career Step graduates are sought after due to Career Step being partnered with companies that hire graduates. Since graduation, I have been unable to find work."

47.     And, as described in Paragraphs 27 through 36 above, most Career Step enrollees are not employed at all—at partner companies, through job placement, or otherwise.

48.     Consumers have complained about Career Step's false job placement claims.  For example, one consumer explained, "The[y] rushed me through the process of signing me up for a Medical Transcription Editor course and promised I would receive help getting a job/receive proper training. I have not received any information."

49.     Career Step knew that these job placement claims were being made and that they were false.  For example, one graduate submitted a complaint to Career Step that stated, "I haven't had much in the way the kind of guidance in finding a job that I was promised from the outset."  Internal notes demonstrate that graduates frequently called in with complaints about this.  One Career Step representative noted that a graduate was "super upset about job placement

18

not being offered. swears was promised this."  In another instance, a representative noted that a "learner is really upset about all the 'lies' the EA [enrollment advisor] told her and 'promises' we are not fulfilling.  Claims EA promised externship for clinicals, also claimed we do job placement."  An internal email from a Career Step compliance specialist reviewing call recordings noted that it was a "Red Flag" when a representative stated that Career Step would help the prospective enrollee find a place to start working, explaining that "this is not the case, we do not do job placement."  Career Step representatives nonetheless continue to make these claims through the present day.

### Externship Placement Claims

50.     Many of Career Step's programs require students to complete an in-person externship experience in addition to their online courses, including the Dental Assistant, Medical Assistant, Pharmacy Technician, Hemodialysis Technician, Patient Care Technician, EKG Technician, Phlebotomy Technician, Medical Laboratory Assistant, and Certified Nursing Assistant programs.  For these programs, failing to complete an externship means failing to complete the program.  Language on Career Step's website and in emails from Career Step representatives gives the impression that consumers enrolled in these programs should expect the externship to be an automatically "included" component of their program. In fact, this inclusion is highlighted as a particular benefit to enrolling with Career Step over other schools.  For example, Career Step's Hemodialysis Technician program site includes the following graphic to describe the program's components, with the externship experience taking the top spot:



After scrolling down, the page continues, "hemodialysis technician training includes your learning material, preparation for the national certification exams, and hands-on clinical experience." Likewise, the Medical Assistant program page says that the program "includes an additional 100-hour externship."

51.     Career Step also instructs representatives to tell prospective students that Career Step will place them in an externship as part of their program. A Career Step email template provided for Career Step representatives to send to consumers interested in the Pharmacy Technician program states, "Externship is included, 200 externship hours that we set up for you! Yes, we set that up for you." Another Career Step form email sent to consumers interested in the Dental Assistant program lists one of the purported benefits of the program as, "Externship Included w/ a local dental practice." Emails sent to consumers interested in the Pharmacy Technician program state, "Externship included @ Walgreen's or CVS Pharmacy" or claim that Career Step "include[s] an externship, your certification exam and graduate services."

52.     In numerous instances, Career Step representatives on the phone with prospective enrollees explicitly promise that Career Step will place them in an externship. Examples of such representations from calls with prospective consumers include:

- "The best part [about the externship] is that we're going to get everything set up for you… we'll find one for you that's within driving distance."

- "Once you're done with the online training, we will set up a hands-on externship

20

for you.  This is somewhere in a hospital or clinic around you."

- "Then when you're done with that [the online course], we're going to set you up for your externship hours.  We're going to find a place near you."

53.    Another Career Step representative promised a prospective enrollee, "Once you're done with the coursework, we'll set you up with an externship so you can go work and study in a dental office."  A few minutes later, the representative doubled down on the claim, stating, "We set up everything for you, that's the really cool part.  You don't have to do anything.  We have a placement team that's gonna [*sic*] plug in your address and it's gonna [*sic*] find all the little dental practices in your area.  We're gonna [*sic*] set you up with one of those right in your area. You can pick and choose your schedule, you can go in and get it done whenever you want." Each of these examples is representative of the types of promises representatives make to prospective Career Step enrollees on the phone in numerous instances.

54.    Far from being automatic, Career Step requires students to complete a series of "necessary prequalification steps" before they will even consider helping them secure an externship.  These steps include, at a minimum, completion of all their coursework, a score of 85% or higher on their final exam, an externship application, a resume, a passed background check, and a passed drug test.  Career Step fails to disclose these requirements to students when promising them an externship as part of their program, and students routinely receive no support from Career Step in completing these steps.  In fact, students frequently report difficulty even getting a response to their questions.  Yet, if a learner is unable to complete all the necessary prequalification steps by the student's original program end date, then Career Step avows "no further obligation to assist the Learner with an externship."

55.    Even if the student does discover and complete all the necessary steps before their

original program end date, then Career Step will only "present one externship opportunity to the Learner that is within one hundred and fifty (150) miles from the Learner's designated address and within one hundred and twenty (120) days from when the Learner has completed and uploaded their application and resume." If the student does not accept the externship opportunity presented (for example, if the drive is too far or the site is not a good fit for the student), or if the student starts an externship that doesn't work out, Career Step asserts "no further obligation to assist the Learner with an Externship." If the student needs additional help with an externship, Career Step recommends the student "purchase a new Externship" from Career Step.

56.     In fact, internal Career Step data shows that most consumers in *externship-required* programs never get placed in an externship. In 2020, only 9% of overall students enrolled in an externship-required program and eligible for an externship placement were actually placed. In 2021, 8% of eligible consumers were placed, while in 2022 the number was only 7%. Most consumers in these programs were not able to complete the prequalification steps outlined above, underscoring the fact that consumers may be unaware of them due to the lack of information and guidance from Career Step during this process. But, even out of those students who did complete their externship application, many were never placed in an externship. For example, in 2020, out of those that did manage to figure out the required steps and submit their externship application on their own, 26% were never placed in an externship. In 2021, 28% of consumers who applied were never placed, while, in 2022, 34% of those that applied were never placed.

57.     Without an externship, these consumers cannot complete their programs, nullifying all the time and money they've already invested with Career Step. One consumer succinctly described the problem as follows: "I finished the online portion only for [C]areer

22

[S]tep to give me the run around about placing me with an externship. I've attempted several times to communicate with two different individuals even stating I would travel to any state to have this externship completed and they keep giving me the run around stating they have reached out to clinics…But yet still collecting their money every month for a course I can't even finish because of their failure to do what was promised."

58.    Claims about externship placement are important to students when choosing a training program, and Career Step is well-aware of this.  In July 2023, Career Step shared an article from "Higher Ed Dive" on its Facebook page that detailed the results of a survey of 7,000 high school students between 2020 and 2023.  The article confirmed that 79% of those surveyed said it was important to them to have "on-the-job learning experiences as part of their higher education" and 65% said "they would ideally learn job skills through internships or similar programs."

59.    Consumers have complained about Career Step's failure to place them in an externship or even assist with the process.  For example, one consumer complained to the Better Business Bureau ("BBB") that Career Step "did not place me [for an externship] and my year for the course was going to expire. I completed the course and waited 155 days to have my case transferred to a manager…During that 155 day wait to be placed I reached out via email and phone several times…During these attempts I was given the same answer or no answer at all about my placement process."  Another consumer explained, "We were promised that included in her program were person to person contact, the course work, materials, an externship…My daughter worked through the entire program and when it was time for her externship No response."  Finally, another consumer complained to the FTC: "Prior to enrollment the program mentioned that they included the externship as well as testing for the national exam but have

23

failed to comply to these standards. I have asked them several times about my externship but I either receive no response, or no direct answer."

## Program Duration Claims

60.     According to Career Step, one benefit of its programs is that they are "surprisingly quick."  Career Step's website positions them as a "better way to learn" compared to other educational programs which they claim are "a huge time-suck, taking years (and years) to complete."  Specifically, their website FAQs tout that "If you study full time (40 hours a week) you can complete most programs in three to four months."

61.     Career Step sales representatives also use speed as a selling point, promising consumers that they will complete their program in a few months or less.  An email template Career Step provided representatives to send to consumers interested in the Pharmacy Technician program touted that the course "can be completed in as little as four months."

62.     Internal call scripts instruct representatives on the phone with interested consumers to emphasize the "quick completion timeline" and tell prospective students that they can expect to finish up "as quickly as 4-6mos."  For example, one representative told a prospective enrollee that "A lot of people finish in 2 months, 3 months, 4 months, it's totally up to you," while another representative during the same time period promised a prospective student that, "In fact, most of our learners will finish the whole program typically in about 2-3 months on average."  A different representative stated that Career Step offered the shortest program in the nation, that they could expect to finish in 4 months or less, and that they regularly have students finish in as little as 90 days.  Another representative told a prospective enrollee that she could "finish up in a couple of weeks, get into a job before her monthly payment."  When another enrollee asked about program duration, the Career Step representative told her, "I mean the

record, the fastest that I ever had anybody finish the program is 1 and 1/2, that's the record. But I'd say for most people that are putting in some effort into it each week, they're getting it done somewhere in between in about 4 to 6 months. Which is pretty average for most of our learners." Finally, another representative assured a prospective student that, "Most people who do put forth the effort into it each week are done with it in about four months, so you can get done with it pretty quickly." These examples are typical of the type of claims made in numerous calls between Career Step representatives and prospective students.

63.     In reality, it takes most Career Step students much longer than four, or even six, months to complete their program. For example, the median time-to-completion for Career Step students who enrolled in 2020 and subsequently completed their program is 435 days (about 14.5 months)—which means half of completers took even longer than that—and the average time-to-completion for Career Step students who enrolled in 2020 and subsequently completed their program is 490 days (more than 16 months). Similarly, the median time-to-completion for consumers who enrolled in 2021 is 396 days and the average time-to-completion is 395 days, both well above the promised 4-months.

64.     Consumers report facing difficulties completing their program in the expected time frame due to Career Step's failures. For example, one consumer complained that her program took an unexpected two years to complete due to the website frequently being down, unclear instructions for completing her course modules, the fact that no one has ever replied to her email requests for assistance, and the fact that she couldn't make an appointment with an instructor. Another consumer recounted how she called Career Step on numerous occasions and got no answer, left voicemail messages that were never returned, and sent emails with questions that took anywhere from days to a week to receive an answer. She lamented that "Career Step

25

has not made good on their promises to provide support & waiting for days or weeks for answers is not conducive to learning this course. Also, when I signed up, I was told this course would take 3 months…However, due to the lack [of] being able to reach a support person, it could take years." Finally, as described in Paragraphs 54 to 59, Career Step often fails to place consumers into the externships they need to be able to complete their programs in a reasonable time frame (or at all).

65.     As a result, many Career Step students have seen their programs expire before they could complete them or have been forced to pay for extensions on their programs, incurring unexpected additional costs ranging from $129 for an additional month to $999 for an additional 12 months of access. As one consumer complained, Career Step touts a quick completion timeline then "trap[s] people into purchasing more and more time to finish the course they already purchased."

66.     Claims about how quickly consumers can complete their program are material to consumers looking to enroll in career training. As one consumer explained, "They offered me an opportunity I thought would be stupid to pass up. It seemed like a prayer answered. A 4-month certification school that would guarantee me a job afterwards in the career I actually wanted to be in, making a salary that would actually put food on the table. Before I even finished making dinner, I was signed up."

67.     In fact, consumers regularly complain about Career Step's misleading program-duration claims. For example, one consumer expressed concern when she realized after starting her program "that the training could not be done in the promising [*sic*] amount of time that they said (4 months)." Another consumer lamented: "I was sold a Medical Billing and Coding program on the basis of being able to complete [it] in a 4-month timeframe. I paid my $3,000

tuition based on getting a certificate in this field in a quick time frame as discussed multiple times with Career Step representatives. I began the program putting in 8 hrs a day minimum…Seeing that I was falling behind my goal of a certificate in 4 months, I contacted Career Step to ask what I was doing wrong."

### Career Step Obtains Customer Financial Information

68.     Career Step's misrepresentations set forth above in Paragraphs 20 to 67, lead consumers to hand over their sensitive personal and financial information to sign up for career-training programs.

69.     Career Step scripts encourage representatives to close the sale and move prospective enrollees straight into the "finance funnel."  Representatives are instructed to ask the consumer if they can pay for their program themselves.  If the answer is yes, the representative takes the consumer's bank account or debit or credit card information and processes payment over the phone.  If the answer is no, the representative suggests an installment plan through Monterey Financial Services ("Monterey"), a third-party financing company that Career Step says "will approve any individual, regardless of their credit history or financial situation."  The representative then takes the consumer's personal and financial information, walks the consumer through Monterey's credit application, and processes the down payment immediately over the phone.

70.     Alternatively, Career Step's "Military Career Advisors" will collect personal information from eligible military servicemembers or their spouses to help them apply for and process their MyCAA or ACA funds to pay for their programs.

71.     In numerous instances, consumers report being rushed through the enrollment process and pressured to make payment without time or opportunity to read the enrollment

agreement before signing.  Some consumers who were enrolled in installment plans through Monterey didn't even realize they were signing up for a loan until they started being billed.

### Career Step's Incentivized Review Program

72.     From at least January 2019 to October 2023,[1] Career Step conducted an incentive program to induce consumers to post reviews about its programs on the BBB website, Google, and Trustpilot.  Career Step created a form email that was sent to at least 94 consumers over a period of months that described Career Step's "Customer Feedback Program" as a program "setup for our customers to give us the feedback we so desperately desire and in return receive a 1-month complimentary extension on their training program."  The email went on to explain that consumers could receive up to 3-months of "complimentary time," by leaving a review on each of the three specified sites.  The email instructed consumers to take a screenshot of their review or copy the link to the review and send it back to the Career Step operations team as proof.

73.     The email from Career Step also noted that consumers should "[b]e sure to disclose within the review, the additional one-month access to the course you will receive for leaving the review, as per the FTC guidelines."  Career Step did not explain what it meant or take any steps to ensure that resulting reviews contained disclosures.  In fact, in numerous instances, when consumers sent links to or screenshots of their incentivized reviews back to Career Step showing that they had not included any disclosures, Career Step representatives accepted and approved the reviews and provided the consumers with their free extension in return.  In some cases, Career Step representatives replied to such reviews thanking the consumers for their postings.  Here is one example:

---

[1] The email template was de-commissioned in October 2023 in response to this investigation. Reviews that were already posted as a part of this incentive program are still available online.



74.     Moreover, the BBB requires consumers to certify that they "have not been offered any incentive or payment originating from the business to write the review."  Without this certification, the BBB would not have posted the reviews.

75.     In numerous instances in connection with this incentive program, Career Step's consumers posted positive reviews on the BBB website, on Trustpilot, and on Google to qualify for free 1-, 2-, or 3-month extensions on their courses.  Because these consumers were still trying to complete their online courses at the time, they likely didn't yet know to complain about many of Career Step's shortfalls, such as the failure to place students in externships or jobs.

76.     These reviews appear to be independent comments reflecting the opinions and experiences of ordinary consumers enrolled in Career Step's career-training programs.  These customers did not disclose that Career Step had offered them a free extension in return for their customer reviews.  These reviews are still visible online through the present day.

*       *       *

29

77.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

78.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

79.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### Misrepresentations

80.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of educational services, Defendant represents, directly or indirectly, expressly or by implication, that:

a)  most learners are employed in their field of study,

b)  more than 80% of graduates/completers obtain employment in their field of study,

c)  Career Step's partnerships with companies result in job placement for Career Step graduates/completers at those companies,

d)  Career Step representatives will find jobs for graduates/completers,

e)  Career Step will place consumers in an externship required to complete the program, and

f)  the average or typical consumer will complete their program in four to six months or less than four months.

81.     Defendant's representations as described in Paragraph 80 are false or misleading and were not substantiated at the time the representations were made.

30

82.     Therefore, Defendant's representations as described in Paragraph 80 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

### False Claim of Independent Reviews

83.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of educational services, Defendant has represented, directly or indirectly, expressly or by implication, that customer reviews of Career Step and its programs on third-party websites reflect the independent opinions or experiences of ordinary impartial customers.

84.     In fact, in numerous instances, these customer reviews on third-party websites do not reflect the independent opinions or experiences of ordinary impartial customers.  In numerous instances, those customers received compensation, including free extensions on their program, to post reviews on the third-party websites.

85.     Therefore, Defendant's representations as described in Paragraph 83 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

### Failure to Disclose Material Connections

86.     Through the means described in Paragraphs 72 to 76, Defendant has represented, directly or indirectly, expressly or by implication, that customer reviews or endorsements of Career Step and its educational services posted on third-party websites reflect their customers' opinions or experiences.

87.     In numerous instances in which Defendant has made the representation set forth in Paragraph 86, Defendant has failed to disclose, or disclose adequately, that some of those

customers received compensation, including free extensions on their training programs, to post those reviews on third-party websites. This fact would be material to consumers in evaluating the reviews in connection with a purchase or use decision.

88.     In light of the representation described in Paragraph 86, Defendant's failure to disclose or disclose adequately the material information as described in Paragraph 87 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT**

89.     Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

90.     The GLB Act defines "customer" to mean "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer." 15 U.S.C. § 6827(2).

91.     Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

92.     Section 814(a) of the FDCPA, in turn, makes a violation of the FDCPA an unfair

or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a). Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule.

93.   Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

94.   Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act. This relief may include, and is not limited to, rescission or reformation of contracts, and the refund of money or return of property.

## Count IV

### Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Consumers' Customer Information of a Financial Institution

95.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of educational services, Defendant has made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution. The customer information of a financial institution that Defendant obtains or attempts to obtain includes consumers' bank account information, credit card numbers, and debit card numbers.

96.     Defendant has obtained or attempted to obtain the customer information of a financial institution by soliciting consumers to enroll into Career Step programs via representations to customers of financial institutions, directly or indirectly, expressly or by implication, that (1) most learners are employed in their field of study; (2) more than 80% of graduates obtain employment in their field of study; (3) Career Step's partnerships with companies result in job placement for Career Step graduates at those companies; (4) Career Step representatives will find jobs for graduates; (5) Career Step will place consumers in an externship; and (6) the average or typical consumer will complete their program in four to six months or less than four months.

97.     Defendant's representations set forth in Paragraphs 95 and 96 were false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

98.     Therefore, Defendant's acts and practices as described in Paragraphs 95 and 96 violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

99.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108.  The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter.  16 C.F.R. Part 310.

100.    The TSR prohibits a "seller" or "telemarketer" from engaging in certain deceptive acts or practices.  A "seller" means "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."  16 C.F.R. § 310.2(dd).  A "telemarketer" means "any

person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."  16 C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

101.    Defendant is a "seller" or "telemarketer" engaging in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

102.    The TSR prohibits certain types of misrepresentations and deceptive conduct in the sale of goods or services.  Subsection 310.3(a)(2) prohibits a seller or telemarketer from misrepresenting, in the sale of goods or services, the total costs to purchase, receive, or use, and the quantity of any goods or services offered for sale; any material restriction, limitation, or condition to purchase, receive, or use the goods or services offered for sale; any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services offered for sale; or any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies.  16 C.F.R. § 310.3(a)(2)(i)-(iv).  The TSR also prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services.  16 C.F.R. § 310.3(a)(4).

103.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Deceptive Telemarketing Calls in Violation of the TSR

104.    In numerous instances, in connection with the telemarketing of educational

services, Defendant misrepresents, directly or indirectly, expressly or by implication, material aspects of their educational services, including, but not limited to, representations that: (1) most learners are employed in their field of study; (2) more than 80% of graduates obtain employment in their field of study; (3) Career Step's partnerships with companies result in job placement for Career Step graduates at those companies; (4) Career Step representatives will find jobs for graduates; (5) Career Step will place consumers in an externship; and (6) the average or typical consumer will complete their program in four to six months or less than four months.

105.   Therefore, Defendant's acts or practices as described in Paragraph 104 violate the TSR, 16 C.F.R. § 310.3(a)(2), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

106.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Gramm-Leach-Bliley Act, and the Telemarketing Sales Rule.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.   Enter a permanent injunction to prevent future violations of the FTC Act, the GLB Act, and the TSR;

B.   Award monetary and other relief within the Court's power to grant; and

C.   Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  07/29/2024                          *Stephanie Liebner*

                                            STEPHANIE LIEBNER
                                            SAMUEL JACOBSON
                                            SALLY TIEU
                                            MICHELLE WHITE
                                            Federal Trade Commission
                                            600 Pennsylvania Avenue NW
                                            Washington, DC 20580
                                            Phone:  202-640-0963
                                            E-mail:  sliebner@ftc.gov

                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION